## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) |
|  | ) Chapter 11 |
| DRUG FAIR GROUP, INC., *et al.*, [1] | ) Case No. 09-10897 (BLS) |
|  | ) |
| Debtors. | ) Joint Administration Requested |
|  | ) |

### MOTION OF DEBTORS AND DEBTORS IN POSSESSION FOR AN ORDER APPROVING AGENCY AGREEMENT, STORE CLOSING SALES, GRANTING LIENS TO AGENT, ABANDONMENT OF PROPERTY AND GRANTING RELATED RELIEF

Drug Fair Group, Inc. and CDI Group, Inc., the debtors and debtors-in-possession herein (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order substantially in the form attached hereto as Exhibit A (a) authorizing the Debtors to close certain retail stores; (b) authorizing the Debtors to conduct store closing sales free and clear of liens pursuant to sections 363(b) of title 11 of the United States Code, (the "Bankruptcy Code"); (c) authorizing the Debtors to enter into an agency agreement providing for the liquidation of merchandise inventory and other assets with Hudson Capital Partners, LLC ("Agent") and granting the Agent liens pursuant to section 364(d) of the Bankruptcy Code; (d) authorizing the Debtors to abandon certain property at the conclusion of the store closing sales; and granting related relief. In support of this Motion, the Debtors respectfully represent as follows:

### Jurisdiction

1.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1] The Debtors in these cases, along with the last four digits of the federal tax identification number for each Debtor, are Drug Fair Group, Inc. f/k/a Community Distributors, Inc. (3660) and CDI Group, Inc. (9976).

2.      The basis for the relief requested herein are sections 105, 363, 364 and 554 of the Bankruptcy Code, Rules 2002, 4001 6004 and 6007 of the Federal Rules of Bankruptcy Prodedure (the "Bankruptcy Rules").

**Background**

**A.      The Chapter 11 Filings**

3.      On March 18, 2009 (the "Petition Date"), the Debtors each filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to manage and operate their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

4.      No official committee of general unsecured creditors  (the "Committee") has been appointed in these cases by the Office of the United States Trustee to date.

5.      This Court has jurisdiction over this Motion under 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2) (M), (N) and (O).  Venue of the Debtors' chapter 11 cases and this Motion is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 6004 and 6006.

**B.      Overview of the Debtors' Corporate Structure and Business**

6.      The Debtors are comprised of two entities, CDI Group, Inc. ("CDI") and Drug Fair Group, Inc. ("Drug Fair").  All of the operations of the Debtors occur through Drug Fair. CDI holds 100% of the issued and outstanding stock of Drug Fair and has no independent operations.   Drug Fair was founded in 1954 under the name Community Distributors, Inc. and changed its name to Drug Fair Group, Inc. in 2006.

7.    In 2005, CDI acquired the stock of Community Distributors, Inc. CDI is owned by CDI Holding Corp. Sun CDI, LLC, which is owned by Sun Capital Partners, IV, LP, owns substantially all of the stock of CDI Holding Corp.

8.    The Debtors are the largest regional drug store chain focused primarily on the northern & central New Jersey market and the twenty-second largest pharmacy chain in the United States. The Debtors operate two distinct divisions: (a) a 46 store chain of traditional drugstores primarily located in easily accessible neighborhoods and shopping centers under the name of "Drug Fair"; and (b) a 12 store chain primarily focused on general merchandise including health and beauty care products, housewares, greeting cards, stationery, candy and seasonal items under the name "Cost Cutters". Four of the Cost Cutters stores contain pharmacies referencing the "Drug Fair" banner.

9.    The Debtors' employed approximately 1,475 employees, none of which are subject to a collective bargaining agreement.

10.    The Debtors are headquartered in Somerset, New Jersey and have their warehouse on the premises. All of the Debtors' facilities, including its stores, are leased.

11.    For the fiscal years ended July 28, 2007 and July 28, 2008 (unaudited), the Debtors recognized net revenues of approximately $8,159,000 and $17,968,000, respectively, and reported a net loss of $8,352,000 and $22,868,000, respectively. As of July 26, 2007 and July 26, 2008 (unaudited), the Debtors' books and records reflected assets of approximately $91,135,000 and $90,677,000, respectively, and liabilities of $100,945,000 and $120,336,000, respectively, at net book values.

C.    **The Debtors' Debt Structure**

12.    The Debtors major pre-petition indebtedness includes, *inter alia*, the following: (a) (i) a Loan and Security Agreement dated as of September 30, 2004 (as amended and in effect, the "Pre-Petition Credit Agreement") with, among others, Bank of America, N.A. (successor by merger to LaSalle Retail Finance, a Division of LaSalle Business Credit, LLC, as agent for LaSalle Bank Midwest National Association f/k/a Standard Federal Bank National Association), as Agent (in such capacity, the "Pre-Petition First Lien Agent") for certain "Revolving Credit Lenders" (as defined therein) (the "Pre-Petition First Lien Lenders", and together with the Pre-Petition First Lien Agent, collectively, the "Pre-Petition First Lien Secured Parties"), and (ii) the "Loan Documents" (as defined in the Pre-Petition Credit Agreement) (collectively, the "Pre-Petition First Lien Loan Documents"), pursuant to which the Pre-Petition First Lien Secured Parties extended to the Debtors a working capital facility providing for revolving credit loans of up to $60,000,000 inclusive of letters of credit of up to $5,000,000; (b) a Loan Agreement dated as of September 30, 2004 (as amended and in effect, the "Pre-Petition Second Lien Credit Agreement") with, among others, Fortress Credit Corp., as Agent (in such capacity, the "Pre-Petition Second Lien Agent") for certain "Lenders" (as defined therein) (together with the Pre-Petition Second Lien Agent, collectively, the "Pre-Petition Second Lien Secured Parties") pursuant to which the Pre-Petition Second Lien Secured Parties provided a term loan to the Debtors that has been paid down to an approximate balance of $20 million; (c) unsecured obligations to Cardinal Health of approximately $17.9 million; (d) approximately $22.1 million in additional trade debt; and (e) approximately $2.9 million in unsecured obligations under promissory notes. CDI guaranteed the obligations of Drug Fair under the Pre-Petition First Lien Loan Documents and Pre-Petition Second Lien Credit Agreement.

13.     The Debtors granted the Pre-Petition First Lien Agent, for its benefit and the benefit of the Pre-Petition First Lien Lenders, liens on and security interests in substantially all of the Debtors' assets to secure their performance under the Pre-Petition Credit Agreement. The Pre-Petition First Lien Agent, pursuant to the Pre-Petition First Lien Loan Documents and related documents, asserts duly perfected and valid first priority liens on and security interests in substantially all of the Debtors' assets.

14.     The Debtors granted the Pre-Petition Second Lien Agent, for its benefit and the benefit of the Pre-Petition Second Lien Lenders, liens on and security interests in substantially all of the Debtors' assets to secure their performance under the Pre-Petition Second Lien Credit Agreement. The Pre-Petition Second Lien Agent, pursuant to the Pre-Petition Second Lien Credit Agreement and related documents, asserts duly perfected and valid second priority liens on and security interests in substantially all of the Debtors' assets, subject to the terms of the "Intercreditor Agreement" (as defined in the Pre-Petition Credit Agreement).

**D.      Events Leading to the Filing**

15.     The Debtors' revenue began to suffer a significant reduction in the first quarter of 2008 due to a variety of factors including competition in both prescription sales and general merchandise.

16.     Throughout 2008, the Debtors instituted a number of initiatives focused on improving operating efficiencies and decreasing fixed costs through eliminating redundant headcount, streamlining processes, and reducing investments in inventory. Nevertheless, the Debtors began to default on their covenants in their Pre-Petition Credit Agreement and Pre-Petition Second Lien Credit Agreement beginning October, 2008.

17.    As of the Petition Date, the Debtors lack the funds necessary to meet projected short-term cash needs due to a lack of availability under the Pre-Petition Credit Agreement and Pre-Petition Second Lien Credit Agreement and lower than expected cash flow from operations.

18.    The Pre-Petition First Lien Lenders agreed to continue to fund the Debtors on a daily basis while the Debtors attempted to find a potential buyer and/or investor in conjunction with either an out of court restructuring or through a bankruptcy proceeding. The Debtors' continuing liquidity problems forced the Debtors to file for chapter 11 protection.

### Relief Requested

19.    By this Motion, the Debtors respectfully request, pursuant to sections 105, 363 and 554 of the Bankruptcy Code and Rules 2002, 4001, 6004 and 6007, entry of an order: (a) authorizing the Debtors to close certain retail stores; (b) authorizing the Debtors to conduct store closing sales at twenty-three (23) store locations, free and clear of liens pursuant to sections 363(b) and (f) of the Bankruptcy Code; (c) authorizing the Debtors to enter into an agency agreement with the Agent providing for the liquidation of merchandise inventory and other assets and granting the Agent liens pursuant to section 364(d) of the Bankruptcy Code; (d) authorizing the Debtors to abandon certain property at the conclusion of the store closing sales and (e) granting such other relief as is fair and equitable.

### A.    Description of the Assets

20.    The assets to be sold at the going out of business sales consist of all "front-end" finished goods inventory owned by the Debtors at stores that, after extensive prepetition efforts to procure bids for the sales of stores as a going concern, did not generate any offers (the "Closing Stores").  The assets to be sold include the "front end" merchandise in the Closing

Stores as of the Sale Commencement Date,[2] including Display Merchandise, certain Defective Merchandise, Distribution Center Merchandise and certain inventory that may be transferred by the Debtors from stores that are not Closing Stores and from the Debtor's Distribution Center (collectively, the "Merchandise"). No prescription drugs, pharmaceuticals and other items historically sold as "back end" items in the stores will be included in the sales.

21.    The assets will also include the furniture, fixtures and equipment owned by the Debtors and located at the Closing Stores and the Debtors' corporate offices and Distribution Center (collectively, the "Owned FF&E").

**B.    The Debtors' Solicitation Efforts**

22.    With the help and support of RAS Management and the CRO, the Debtors explored certain strategic alternatives in order to maximize their value.    After the Debtors identified which of their stores were not saleable as going concerns through an intensive bidding process, the Debtors, with input from RAS Management, determined that going out of business sales supervised by one or more experienced and reputable liquidators would achieve the maximum values for the assets located in the Closing Stores and the Debtor's Distribution Center, would minimize shrinkage, and would minimize administrative expenses. In addition, the proceeds of the Store Closing Sales will further benefit the Debtors' estates by reducing the Debtors' secured debt.

23.    RAS Management and the Debtors prepared due diligence materials to distribute to nationally known liquidators. RAS Management worked with the Debtors to develop a list of suitable liquidators to be contacted on a confidential basis, after approval by the Debtors.

---

[2] Capitalized terms shall have the same definition as stated in proposed Agency Agreement unless otherwise defined in the Motion.

24.    To maximize the value of the Merchandise and the Owned FF&E (together with the Merchandise, the "Assets"), the Debtors intend to engage Hudson Capital Partners, LLC ("Hudson"), a national liquidation firms that specializes in, among other things, the large scale liquidation of inventory and Owned FF&E of this type and scale as the  Agent.  Through the use of such liquidation firm, the Debtors will ensure the most feasible, economical, and efficient means of achieving the disposition of the Assets.

25.    On February 10, 2009, the Debtors engaged in an extensive negotiation process prior to selecting Hudson as the liquidator.  The Debtors and RAS Management contacted six (6) national liquidation firms and provided them each with extensive documentation and information, including information on the Debtors' inventory by SKU, department and store, as well as store cost information.  Additional data was sent over the following several weeks to provide the liquidators with updated information.  The Debtors and RAS Management conducted conference calls and on site meetings with several of the bidders.  Three (3) of the liquidators submitted bids on a fee basis, with two (2) of the bidders participating in a joint bid.  Two (2) other liquidators participated in the process, but never submitted bids.  Two (2) liquidators, including Hudson, submitted equity bids with a guaranteed amount based upon the cost value of the Debtors' inventory.  The Debtors, along with RAS Management, then negotiated with the two (2) bidders submitting equity bids with a guaranty to obtain the best economic and contractual terms.

26.    After consulting with the Debtors' Board of Directors and professionals, the Debtors determined, in the reasonable exercise of their business judgment, that the retention of Hudson as the Agent was in the best interest of the estates and their creditors and hereby seek authority to so retain Hudson as their Agent and to approve the Agency Agreement with Hudson.

27.     Accordingly, the Debtors request the entry of an order, pursuant to Sections 105(a), 363(b), (f), and (m), and 364(d)(1) of the Bankruptcy Code and Bankruptcy Rules 6004 and 4001, approving (i) the agency agreement with the Agent (the "Agency Agreement"), (ii) the Store Closing Sales and waiving the Debtors' compliance with state and local laws, statutes, rules, ordinances and/or lease provisions restricting the Store Closing Sales, and (iii) the procedures to be used governing the conduct of the Store Closing Sales (the "Sale Guidelines"). A copy of the proposed order is attached hereto as Exhibit A.

## The Proposed Store Closing Sales

28.     The Debtors propose to commence the Store Closing Sales immediately following the hearing on this Motion, and thereby stem the losses resulting from the continued operation of the Closing Stores. The Debtors also seek authority to enter into the Agency Agreement with the Agent who will serve as the Debtors' agent in conducting the Store Closing Sales in accordance with the Sales Guidelines, which procedures and guidelines are typical of and consistent with those that have been approved in this and bankruptcy courts nationwide in similar transactions.

29.     It is critical to commence the Store Closing Sales as soon as possible for several important reasons. First, the Closing Stores are operating at a loss and represent a drain on the Debtors' liquidity. Thus, the sooner the Assets are sold (and the Closing Stores' leases are either sold or rejected), the sooner the strain on the Debtors' liquidity will be mitigated. Second, delays in the liquidation process could cause portions of the Merchandise to become out of "season" or out of date, thus, diminishing in value.     Third, because the Closing Stores have not been replenished with front end merchandise and inventory levels are diminishing, Hudson has made it's agreement contingent upon commencing the Store Closing Sales on Saturday, March 21, 2009.

**The Agency Agreement.**

30.     A form of agency agreement served as the basis for the initial bids in the informal auction, which allowed the Debtors to easily compare and contrast the differing terms of the bids submitted by the liquidation firms. After further negotiation with the bidders and consultation with the Debtors' professionals, Board of Directors, and creditor constituents, the Debtors agreed (subject to this Court's approval) to enter into the Agency Agreement with Hudson in the form attached hereto as Exhibit B.

31.     Although the Debtors respectfully refer the Court to the Agency Agreement in its entirety, certain of the material terms are set forth below (with all capitalized terms having the meaning ascribed thereto in the Agency Agreement):

- Guaranteed Amount.  As a guaranty of the Agent's performance under the Agency Agreement, the Agent will guarantee that the Debtors shall recover 44% (the "Guaranty Percentage") of the Cost Value of the Merchandise included in the Sale.

- Recovery Amount.  To the extent that the proceeds realized from the sale exceed the Guaranteed Amount and the expenses of the sale (the "Sharing Threshold"), the first 5% of the aggregate Cost Value of the Merchandise will be paid to the Agent as a fee (the "Agent's Fee"), the next 2% of the aggregate cost value of the Merchandise will be shared 50% to the Debtors and 50% to the Agent and all remaining proceeds above these increments will be shared 70% to the Debtors and 30% to the Agent.

- Expenses Reimbursed by Agent.  From the Sale Commencement Date through and including the Sale Termination Date, Agent shall be unconditionally responsible for all Expenses enumerated in Section 4.1 of the Agency Agreement (including, without limitation, Occupancy Expenses, Payroll, benefits for Retained Employees, Agent's on-site supervision related costs, signs and banners, promotional costs, Sale supplies, telephone, postage/overnight or delivery/courier charges, utility charges, credit card and bank fees, costs related to moving, transferring or consolidating merchandise between Closing Stores, insurance costs, trash removal and cleaning costs, security and building alarm costs, cost of capital and letter of credit fees, and any Retention Bonuses for Retained Employees and 50% of the cost of the physical inventory taking), incurred in conducting the Sale during the Sale Term, which Expenses may be

funded and paid from Proceeds of the Sale to the extent available and In accordance with other applicable provisions of the Agency Agreement.

- <u>Agent's Fee</u>. In consideration of the services to be provided by the Agent pursuant to the Agency Agreement, the Agent would be entitled to retain all Proceeds from the Sale of the Merchandise, after payment by Agent of Expenses of the Sale. In addition, the Agent would be paid 20% of the proceeds from the sales of Merchant's Consignment Goods and Owned FF&E.

- <u>Payment</u>. Prior to the Sale Commencement Date, the Agent shall wire to the Debtors the Guaranteed Amount. Agent shall pay an additional Guaranteed Amount on account of transferred Merchandise from other stores or the Debtor's Distribution Centers following receipt thereof in the Closing Stores.

- <u>Inventory Taking</u>. Debtors and Agent will jointly conduct a physical inventory taking in all of the Closing Stores for purposes of calculating the aggregate Cost Value of the Merchandise in the Closing Stores, pursuant to Inventory Taking Instructions to be agreed upon between Debtors and Agent. Distribution Center Merchandise will be counted as it is received in the Closing Stores as part of the Weekly Sale Reconciliations.

- <u>Sale Term</u>. Agent shall have the right to conduct the Store Closing Sales commencing the day after entry of the Approval Order, provided the Approval Order is entered on or before March 20, 2009, through and including May 31, 2009; <u>provided</u> <u>however</u>, to the extent that the Debtors and the Agent agree to extend the Store Closing Sales beyond the fixed Sale Termination Date, they will be required to give notice to affected parties.

- <u>Sale Guidelines</u>. The Store Closing Sales shall be conducted in accordance with the Sale Guidelines attached to the Agency Agreement as Exhibit 1. Agent shall be authorized to advertise and promote the sales as a store closing or similar themed sale. Agent shall be authorized to advertise or promote the Store Closing Sale as a "going-out-of-business" sale.

- <u>Employees</u>. The Agent shall have the right to use the Debtors' store-level employees during the Sale Term and will reimburse the Debtors for actual payroll, and Employee Benefits up to an agreed upon cap based upon a percentage of the aggregate base payroll. Agent may elect to pay, as an expense, a retention bonus up to a maximum of 10% of base payroll to certain retained employees. The employees will remain the Debtors' employees at all limes.

- <u>Merchandise Returns/Gift Cards/Other Programs</u>.  Although sales of all items of Merchandise sold during the Sale Term shall be a "final sale", the Agent will accept returns of Merchandise sold prior to the Sale Commencement Date at the Closing Stores for 14 days after the Sale Commencement Date.   In addition the Agent shall accept Debtors' unexpired gift cards, "We Care" coupons and store credits issued by the Debtors during the Sale Term.  The Debtors shall reimburse the Agent for such coupons and store credits, gift certificates, gift cards and rebates that were honored at the Closing Stores in accordance with the terms of the Agency Agreement.   The Agent shall not honor any discount coupons issued by the Debtors' competitors either prior to or during the Sale Term.

- <u>Weekly Reconciliation</u>.  On each Thursday during the Sale Term, the Agent and the Debtors shall reconcile amounts due and owing as between them.

- <u>Security Interest in Merchandise and Proceeds Thereof</u>.  Subject to the Agent's payment of the Guaranteed Amount and Agent's obligation to pay Expenses of the Sale, and to pay the Debtors 80% of the proceeds from the sale of Merchant's Consignment Merchandise and Owned FF&E, if any, the Agent shall be granted a first priority lien on the Merchandise, Owned FF&E and the Proceeds from the Store Closing Sale.

32.     The Debtors believe that the terms of the Agency Agreement are typical, customary and reasonable under the circumstances in the exercise of their prudent business judgment.

### The Store Closing Sales Notice

33.     Under Bankruptcy Rule 2002(a) and (c), the Debtors are required to notify their creditors of the Store Closing Sales, including (i) the terms and conditions of the Store Closing Sales; (ii) the date, time, and place of the Sale Hearing; and (ii) the deadline for filing any objections to the relief requested herein (the "<u>Store Closing Sales Notice</u>").   The Debtors respectfully submit that the form of Store Closing Sales Notice, attached hereto as <u>Exhibit C,</u> is typical for store closing sales previously approved in this District. Copies of the Store Closing Sales Notice were served by either hand delivery, electronic mail, facsimile, or overnight mail to: (a) the U.S. Trustee; (b) the entities listed on the Consolidated List of Creditors Holding the 30

Largest Unsecured Claims; (c) counsel to the Debtors' Prepetition First Lien Lenders and Postpetition Lenders; (d) counsel to the Debtors Prepetition Second Lien Lenders; (e) the Internal Revenue Service; and (f) each of the Debtors' landlords for the Closing Stores.  The Debtors request that such notice be deemed adequate and sufficient notice as required by the Bankruptcy Rules.

### Approval of Store Closing Sales Under Section 363 and for the Sale of Merchandise Free and Clear of All Encumbrances is Warranted

34.    Section 363(b)(1)of the Bankruptcy Code provides:

> The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate" ,.

11 U.S.C. § 363(b)(1); see also In re Ames Dep't Stores, Inc." 136 B.R. 357, 359 (Bankr. S.D.N. Y. 1992) (holding that going-out-of-business sales are governed by section363(b)).

35.    To obtain Court approval to use property under section 363(b) of the Bankruptcy Code for the purpose of a store closing sale, the Debtors must articulate a business reason for the proposed action.  See e.g., Myers v. martin (In re Martin) 91 F.3d 389, 395 (3d Cir. 1996) (citing Fulton State Bank v. Schipper (In re Schipper) 933 F.2d 513, 515 (7th Cir. (1991)); Comm. Of Equity Sec. Holders v. Lionel Corp, (In re Lionel Corp.), 722 F.2d 1063, 1070-71 (2d Cir. 1983); In re Abbotts Dairies, Inc." 788 F.2d 143, 147-48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of Lionel Corp. and requiring good faith); In re Delaware & Hudson Ry, Co., 24 B.R. 169,175-76 (D.Del. 1991) (concluding that the Third Circuit adopted the "sound business judgment" test in the Abbotts Dairies decision); Dai-Icho Kangyo Bank v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (Bankr, D, Del. 1999) (same).  "Under Delaware law, the business judgment rule operates as a presumption 'that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest.'"

Continuing Creditors' Committee of Star Telecomms., Inc. v. Edgecomb, 385 F.Supp.2d 449,

462 (D. Del. 2004) (*quoting* Grobow v. Perot, 539 A.2d 180, 187 (Del. 1988)); *see also* Ad Hoc

Committee of Equity Holders of Tectonic Network, Inc. v. Wolford, 554 F.Supp.2d 538, 555

n.111 (D. Del. 2008). Thus, this Court should grant the relief requested in this Motion if the

Debtors demonstrate a sound business justification therefore. *See* In re Delaware Hudson Ry.

Co., 124 B.R. 169 , 179 (D. Del. 1991)

36.     The Debtors have a sound business justification for selling the Assets at this time.

Based on the results of their analysis of the Debtors' ongoing and future business prospects, the

Debtors' management and team of financial advisors have concluded that a sale of all or some of

their Assets in accordance with the procedures set forth in the Sale Guidelines may be the best

method to maximize recoveries to the estates. Maximization of the Assets' value is a sound

business purpose warranting authorization of any proposed Sale. When a valid business

justification exists, the law vests the debtor's decision to use its property with a strong

presumption "that in making a business decision[,] the directors of a corporation acted on an

informed basis, in good faith and in the honest belief that the action taken was in the best

interests of the company." Official Comm. Of Subordinated Bondholders v. Integrated Res., Inc.

(In re Integrated Res., Inc.), 147 B.R. 650,656 (S.D.N.Y. 1990) (holding that the Delaware

business judgment rule has "vitality by analogy" in Chapter 11, especially where the debtor is a

Delaware corporation) (quotations omitted).  In this District, once a court is satisfied that there is

a sound business justification for the proposed sale, the court must then determine whether (i) the

debtor-in-possession has provided the potential bidders with adequate and reasonable notice, (ii)

the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith, In re

Delaware and Hudson Ry. Co." 124 B.R. at 176; accord In re Decora Indus., Inc" 2002 WL

32332749 at *3 (D. Del. 2002); see also In re Integrated Res.," Inc" 147 B.R. at 656 (parties challenging a debtor's sound business decision must show bad faith, self-interest or gross negligence).

37.    Ample business justification exists in these cases to approve the proposed Store Closing Sales. The Debtors, with the assistance of their advisors, have determined to close the Closing Stores by means of the Store Closing Sales as set forth in the Agency Agreement, and begin the monetization of the Assets.  Time is of the essence to preserve and maximize the value of the Debtors' assets before the Merchandise declines in value, and to reduce on-going administrative expenses.  Each of the Closing Stores contains significant levels of Merchandise that will be included in the Store Closing Sales.  The realization of fair value for these assets as promptly as possible will inure to the benefit of all stakeholders.  Therefore, the Debtors propose to commence the Store Closing Sales at the Closing Stores immediately upon the entry of an order approving the Agency Agreement.

38.    Store closing or liquidation sales are a routine occurrence in chapter 11 cases involving retail debtors.  See In re Ames Dept. Stores, Inc.," 136 B.R. at 359 (holding that "going out-of-business" sales arc an important part of "overriding federal policy requiring [a] Debtor to maximize estate assets").  Bankruptcy courts in this District have approved similar store closing sales.  See In re Linens Holdings Co., Ch, 11 Case No. 08-10832 (CSS) (Jointly Administered) (Bankr. D. Del. [Date]; (order authorizing Debtor to conduct store closing sales through an agent); In re TSIC, Inc., Ch, 11 Case No. 08-10322 (KG) (Bankr, D. Del. [Date] (order authorizing Debtor to conduct store closing sales through an agent); In re Tweeter Home Entm't Group, Inc.", Ch. 11 Case No. 07-10787 (PJW) (Jointly Administered) (Bankr. D, Del. July 13, 2007) (final order authorizing debtor to continue store closing sales pursuant to store

closing agreement); In re Three A's Holdings, L.L.C., Ch. 11CaseNo, 06·10886 (BLS) (Jointly

Administered) (Bankr, D. Del. Sept. 25, 2006) (order authorizing, among other things, agent to

conduct store closing sales); In re M T S Inc., Ch. 11Case No.04·10394 (PJW) (Bankr. D. Del.

Mar. 2, 2004)(same);  In re Wherehouse Entm't, Inc.,. Ch,.11 Case No. 03·10224 (PJW) (Bankr.

D. Del. Feb. 21, 2003) (same); In re Zany Brainy, Inc., Ch.11 Case No. 01-1749 (MFW) (SLR)

(Bankr. D. Del. Oct. 11, 2001) (same).

## The Court Should Waive Compliance with Any State and Local Laws. Statutes, Rules and Ordinances Restricting Store Closing

39.    Many state and local laws, statutes, rules and ordinances require special licenses,

waiting periods, time limits and other cumbersome procedures for store closing, liquidation or

similar sales.  By virtue of 28 U.S.C. § 1334, this Court has exclusive jurisdiction over the

Debtors' property wherever located. 28 U.S.C. § J334. In the context of bankruptcy cases,

therefore, since parties in interest receive notice of the proposed sale, as well as opportunity to be

heard in this Court, enforcement of such statutes and regulations is redundant and unnecessary.

40.    The Bankruptcy Code preempts state and local laws that conflict with its

underlying policies. See Belculfine v. Aloe (In re: Shenango Group, Inc.), 186 B.R. 623, 628

(Bankr. W.D. Pa, 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal

obligations pursuant to the bankruptcy code.'... '[A] state statute[] cannot place burdens on them

where the result would contradict the priorities established by the federal bankruptcy code."),

aff'd, 112 F.3d 633 (3d Cir, 1997).  While preemption of state law is not always appropriate, see

Baker & Drake, Inc. v. Public Serv. Comm'n of Nev. (In re Baker & Drake, Inc.), 35 F.3d 1348,

1353-54 (9th Cir, 1994) (holding that Bankruptcy Code did not preempt state law prohibiting

taxicab leasing that was promulgated in part as public safety measure), preemption is appropriate

where, as here, the only state laws involved concern economic regulation rather then the

protection of public health and safety.[3]    See id. at 1353 (finding that "federal bankruptcy preemption is more likely... where a state statute is concerned with economic regulation rather than with protecting the public health and safety"); See also  In re Scott Housing Sys, Inc., 91 B.R. 190, 196-97 (Bankr. S.D. Ga. 1988) (holding that automatic stay under Section 362 is broad and preempts state law except for those laws designed to protect public health and safety).

41.    Here, state and local licensing requirements, time limits or other restrictions on liquidation sales would undermine the fundamental purpose of Section 363(b) of the Bankruptcy Code by placing constraints on the Debtors' ability to marshal and maximize estate assets for the benefit of creditors.    Accordingly, authorizing the Store Closing Sales without the delays and burdens associated with obtaining various state and local licenses, observing state and local waiting periods or time limits, and/or satisfying any additional requirements with respect to advertising and the like is necessary and appropriate.

42.    It is also necessary that any action by any lessor or any federal, state or local agency, department or governmental authority or any other entity to prevent, interfere with or otherwise hinder consummation of the Store Closing Sales or advertisement of such sales be enjoined. See Missouri v. U.S. Bankruptcy Court, 647 F.2d 768, 776 (8th Cir, 198J) (same), cert. denied, 454 U.S. 1162 (1982) (holding that attempt to enforce state regulations governing liquidation of grain warehouses directly conflicted with bankruptcy court's control over property of debtor's estate and therefore violated automatic stay).

43.    The requested waiver is narrowly tailored to facilitate the successful consummation of the Store Closing Sales. The Debtors do not seek a general waiver of all state and local requirements, but only those that apply specifically to liquidation sales. As noted

---

[3] The Debtors will comply with applicable state and local public health and safety laws ("Safety Laws"), and applicable tax, labor, employment. environmental) and consumer protection laws, including consumer laws regulating deceptive practices and raise advertising (collectively, "Consumer Laws").

above, the Debtors fully intend to be bound by and comply with all Consumer and Safety Laws, and will require that their Agent do the same.

44.     Similar relief has been granted in other bankruptcy cases in this District. See, e.g. In re Tweeter Home Entm't Group, Inc., Ch. 11 Case No. 07-10787 (PJW) (Jointly RLFI-3312626-1 Administered) (Bankr. D. Del. July 13, 2007) (final order authorizing debtor to continue store closing sales pursuant to store closing agreement); In re Three A's Holdings, L.L.C., Ch, 11 Case No. 06-10886 (BLS) (Jointly Administered) (Bankr, D. Del. Sept, 25, 2006) (order authorizing, among other things, agent to conduct store closing sales); In re M T S Inc., Ch. 11 Case No. 0410394 (PJW) (Bankr, D. Del. Mar. 2, 2004) (same); In re Zany Brainy, Inc., Ch. 11  Case No. 01-1749 (MFW) (Bankr. D. Del. Oct. 11, 2001) (SLR) (same).

**The Court Should Waive Any Restriction on Store Closing Sales in the Leases As Unenforceable**

45.     Certain of the leases governing the premises of the Closing Stores (the "Leases") may contain provisions purporting to restrict or prohibit the Debtors from conducting store closing, liquidation, or similar sales.  Such provisions have been held to be unenforceable in chapter 11 cases as they constitute an impermissible restraint on a debtor's ability to effectively reorganize and maximize the value of its assets under Section 363 of the Bankruptcy Code. See, In re Ames Dep't Stores, Inc., 136 B.R. at 359 (holding that enforcement of such lease restrictions would "contravene overriding federal policy requiring debtor to maximize estate assets...."); In re R. H. Macy and Co., Inc., 170 B.R. 69, 73-74 (Bankr. S.D.N.Y. 1994) (holding that the lessor could not recover damages for breach of a covenant to stay open because the debtor had a duty to maximize the value to the estate and the debtor fulfilled this obligation by holding a store closing sale and closing the store.); In re Tobago Bay Trading Co., 112 B.R. 463, 467-68 (Bankr. N.D. Ga., 1990) (finding that a debtor's efforts to reorganize would be

significantly impaired to the detriment of creditors if lease provisions prohibiting a debtor from liquidating its inventory were enforced); In re Lisbon Shops, Inc., 24 B.R.693, 695 (Bankr. E.D. Mo. 1982) (holding restrictive lease provision unenforceable in Chapter 11 case where debtor sought to conduct going-out-of-business sale).

46.    As such, to the extent that such provisions or restrictions exist in any of the Leases of the Closing Stores, such landlords may not interfere with or otherwise seek to restrict the Debtors and/or the Agent from conducting the Store Closing Sales.  Accordingly, the Debtors request that the Court authorize the Debtors and/or the Agent to conduct the Store Closing Sales without interference by any landlords or other persons affected, directly or indirectly, by the Store Closing Sales.

47.    Bankruptcy courts in this District have held that restrictive lease provisions affecting store closing sales in chapter 11 cases are unenforceable.  See, In re Tweeter Home Entm't Group, Inc. Ch. 11 Case No, 07-10787 (PJW) (Jointly Administered) (Bankr, D, Del. July 13, 2007) (final order authorizing debtor to continue store closing sales pursuant to store closing agreement); In re Three A's Holdings, L.L.C. Ch. 11 Case No, 06-10886 (RLS) (Jointly Administered) (Bankr, D. Del. Sept. 25, 2006) (order authorizing, among other things, agent to conduct store closing sales); In re M T S Inc. Ch. 11 Case No. 04-10394 (BLS) (Bankr. D. Del. Mar. 2, 2004) (same); In re Wherehouse Entm't, Inc. Ch. 11 Case No.03-10024 (PJW) (Bankr. D. Del. Feb. 21, 2003) (same); In re Zany Brainy, Inc., Ch. 11 Case No. 01-1749 (MFW) (opinion by Robinson, D.J.) (Bankr, D. Del. Oct, 11, 2001) (same); In re Just For Feet, Inc. Case No, 99-4110 (RRM) (Bankr. D. Del. Nov. 26, 1999) (same); In re London Fog, Inc., Case No. 99-3446 (PJW) (Bankr, D, Del. Oct. 7, 1999) (same).

**A Sale of Assets Free and Clear Of All Encumbrances is Warranted**

48.    The Debtors request approval to sell the Assets subject to the Agency Agreement, on a final "as is" basis, free and clear of any and all liens, claims and encumbrances in accordance with section 363(f) of the Bankruptcy Code. A debtor in possession may sell property under sections 363(b) and 363(f) "free and clear of any interest in such property of an entity other than the estate" if anyone of the following conditions is satisfied:

- applicable non-bankruptcy law permits sale of such property free and clear of such interest;

- such entity consents;

- such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

- such interest is in bona fide dispute; or

- such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); Citicorp Homeowners Servs., Inc., v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that since Section 363(f) is written in the disjunctive, the court may approve a sale free and clear if anyone subsection is met). The DIP Lenders, who are secured by, among other things, the Assets, has consented to the sale of the Assets. With respect to any other party asserting a lien, claim, or encumbrance against the Merchandise or the Owned FF&E, the Debtors anticipate that they will be able to satisfy one or more of the conditions set forth in Section 363(f). In connection with the sale of the Assets pursuant to the terms and conditions of the Agency Agreement, the Debtors propose that any liens, claims, and encumbrances asserted against the Merchandise be transferred to and attach to the amounts payable to the Debtors under the Agency Agreement, in the same order of priority and subject to the rights, claims, defenses, and objections, if any, of all parties with respect thereto, provided that the Debtors' share of the

proceeds of the Store Closing Sales, including the Guaranteed Amount, shall be applied in accordance with any interim or final orders approving DIP credit facility.

### The Debtors Should Be Authorized to Abandon Certain Property at the Stores and Distribution Centers Following the Conclusion of the Store Closing Sales

49.     Bankruptcy Code § 554(a) provides that after notice and a hearing, the trustee, and therefore the debtor-in-possession, "may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value  and benefit to the estate." See Hanover Ins. Co. v. Tyco Indus., Inc., 500 F.2d 654, 657 (3d Cir.1974) (a trustee " may abandon his claim to any asset, including a cause of action, he deems less valuable than the cost of asserting that claim"); In re Grossinger's Assoc., 184 B.R. 429, 432 (Bankr.S.D.N.Y.1995). See also Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protection, 474 U.S. 494, 507 (1986) ("[A] trustee [in a bankruptcy] may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards.... This exception to the abandonment power ... is a narrow one."); In re Bryson, 53 B.R. 3, 4-5 (M.D.Tenn.1985) ("The effect of the abandonment is to remove the asset from the jurisdiction of the bankruptcy court." (quoting In re Helms, 1991 WL 284111, at * 1 (E.D. La.1991)).

50.     The Debtors hereby request that they be authorized upon the conclusion of the Store Closing Sales to abandon any of their remaining FF&E or other assets (at the Stores, the Distribution Centers, the Debtors' corporate offices, or otherwise) without incurring liability to any person or entity. The Debtors submit that if they are unable to sell or dispose of any such assets during a Store Closing Sale or otherwise, it would be costly and burdensome to the estate to retain them.

51.    In the event of such abandonment, the Debtors request that the applicable landlord be authorized to dispose of such property without any liability to any individual or entity that may claim an interest in such abandoned property and that such abandonment be without prejudice to any landlord's right to assert any claims based on such abandonment and without prejudice to the Debtors or other party-in-interest to object thereto.

52.    Notwithstanding the foregoing, the Debtors and the Agent would utilize all commercially reasonable efforts to remove or cause to be removed any confidential or personal identifying information (which means information which alone or in conjunction with other information identifies an individual, including, but not limited to, an individual's name, social security number, date of birth, government-issued identification number, account number, and credit or debit card number) in any of the Debtors' hardware, software, computers or cash registers or similar equipment that are to be sold or abandoned.

### Request for Waiver of Stay

53.    In addition, the Debtors seek a waiver of the 10-day stay required under Bankruptcy Rule 6004(h).  As set forth above, the Debtors are facing significant liquidity constraints. Given both this liquidity crisis and the potential decline in value of the Assets, the Debtors and the Agent want to close on this transaction as soon as possible. Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 10-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d), to the extent that they apply.

### Notice

54.    The Debtors have provided notice of this motion by either hand delivery, electronic mail, facsimile, or overnight mail to: (a) the U.S. Trustee; (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims; (c) counsel to the Debtors' Prepetition First Lien Lenders and Postpetition Lenders; (d) counsel to the Debtors

Prepetition Second Lien Lenders; (e) the Internal Revenue Service; and (f) each of the Debtors' landlords for the Closing Stores.  In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

### No Prior Request

55.    The Debtors have made no previous application for the relief requested herein to this or any other court.

56.    The Debtors submit that this Motion does not present any novel issues of law requiring briefing beyond the citation of authorities contained herein.  Therefore, pursuant to Rule 7.1.2 of the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware (the "Local District Court Rules"), incorporated by reference into Del. Bankr. LR 1001-1(b), the Debtors respectfully request that the Court set aside the briefing schedule set forth in Rule 7.1.2(a) of the Local District Court Rules.

WHEREFORE, the Debtors respectfully request the entry of the order, substantially in the form attached hereto as <u>Exhibit A</u>, granting the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated: March 18, 2009                KLEHR, HARRISON, HARVEY,
       Wilmington, Delaware        BRANZBURG & ELLERS, LLP


By:   /s/ *Domenic E. Pacitti*
       Domenic E. Pacitti, Esq. (DE Bar No. 3989)
       Michael W. Yurkewicz, Esq. (DE Bar No. 4165)
       919 Market Street, Suite 1000
       Wilmington, DE 19801
       Telephone: (302) 426-1189
       Facsimile: (302) 426-9193
       dpacitti@klehr.com

           and

       Carol Ann Slocum, Esq.
       457 Haddonfield Road
       Cherry Hill, NJ 08002
       Telephone: (856) 486-7900
       Facsimile: (856) 486-4875
       cslocum@klehr.com

       Proposed Counsel for the Debtors
       and Debtors-in-Possession